ORDERED.

Dated: April 29, 2022

Roberta A. Colton
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

Jaffan International, LLC,    Case No. 8:22-bk-00459-RCT
 *dba* Crave Restaurant and Bar    Chapter 11

   Debtor(s).

**MEMORANDUM DECISION AND ORDER FOLLOWING TRIAL ON AMENDED MOTION FOR RELIEF FROM THE AUTOMATIC STAY, DENYING REQUEST TO LIFT THE STAY, AND DIRECTING ADDITIONAL ADEQUATE PROTECTION**

On April 19, 2022, the Court conducted a near day-long trial on the Amended Motion for Relief from the Automatic Stay (Doc. 23) (the "Motion") filed by Radhe Krishna Properties LLC (the "Landlord") and Debtor's opposition to the Motion (Doc. 34). The trial on the Motion was set after two preliminary hearings and with the benefit of supplemental briefing by the parties[1] and was limited in scope to the narrow issue of whether the term of the lease between the parties had been properly extended.[2]

At trial, the Court heard testimony of Nilesh Sutaria, Landlord's corporate representative, Maher Jaffan, Debtor's president and principal, and Tushar Choksi, Mr.

---
[1] Docs. 42 & 47.
[2] Doc. 55.

Sutaria's brother-in-law and the proprietor of a grocery store located in the same shopping center as Debtor. The Court admitted fifteen exhibits offered by the Landlord and twenty-one offered by the Debtor.[3] After the close of the evidence, the Court provided the parties until April 22 to file their closing arguments. Both arguments were timely filed.[4]

Based on the documentary evidence and credible testimony adduced at trial, and upon due consideration of the parties' papers, together with the record and the relevant case law, the Court finds that the Motion should be denied, without prejudice. But the Court also finds that for the Debtor to continue to enjoy the benefit of the automatic stay, additional adequate protection must be provided to Landlord.

<u>Jurisdiction</u>

This Court has jurisdiction over this proceeding under 28 U.S.C. §§ 157 and 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(G).

<u>Facts</u>

In August 2016, Debtor and Landlord entered into a lease agreement for the premises located at 2001 East Fowler Avenue, Suite B, Tampa, Florida 33612 (the "Property"), with an initial five-year term commencing September 1, 2016, and ending August 31, 2021 (the "Lease").[5] At the Property, Debtor operates a Mediterranean restaurant and bar named Crave Restaurant and Bar. Though the lease term commenced on September 1, 2016, Debtor did not open its doors officially until July 2018. The restaurant's opening was delayed, in part, due to zoning issues. Prior to opening the restaurant's doors, Mr. Jaffan invested significant sums to prepare the premises for Debtor's intended purpose and to resolve the zoning issues.

---

[3] *See* Docs. 92 & 93 (annotated exhibit lists). The Landlord's exhibits may be found in the record at Doc. 81 ("LL's Ex. ___) while the Debtor's exhibits may be found at Doc. 82 ("D's Ex. ___).
[4] Docs. 94 & 95.
[5] LL's Ex. 1; D's Ex. 1.

The parties' first three years under the terms of the lease, while not overly fraught with controversy, were not smooth sailing. Debtor struggled to pay rent timely, and there was confusion over which party was responsible for the payment of the utilities related to Debtor's use of the Property. In October 2019, the parties entered into a *Settlement Agreement and Amendment to Lease* (the "Addendum")[6] that in relevant part, contained broad mutual releases, clarified the party responsible for the payment of utilities, provided a means for Debtor to cure disputed unpaid rent for the period ending October 31, 2019, and amended the lease to change the due date for the payment of rent from the first of the month to the tenth.

It is undisputed that the Lease and Addendum constitute the entire formal written agreement between the parties. The relevant provisions of the Lease are:

> [2.3] B.   RENEWAL OPTIONS. [Debtor] shall have two (2) renewal options, for a period of five (5) years each, which such renewal options may be exercised in accordance with the provisions contained in Section 24 hereof (the Initial Term and any exercised renewal option shall collectively be referred to herein as the "Term").
>
> 5.1    LEASE TERM. The Term of this Lease starts on the Commencement Date, and continues for the number of Lease Years specified in Section 2.3. The Term shall end upon the passing of said number of Lease Years after the Commencement Date, subject to extension upon [Debtor's] exercise of its renewal option described in Section 2.3 B.
>
> 17.1    LATE CHARGES. . . . Should [Debtor] fail to pay any such Rent or other monetary obligation when due, then interest shall accrue from five (5) days after the due date as the rate of fifteen percent (15%) per annum, but not greater than the maximum rate permitted by law (the "Default Rate"), together with a late charge of [$150.00] to cover Landlord's extra expense involved in collecting such delinquent sums. . . .
>
> 17.2    EVENTS OF DEFAULT: REMEDIES. The following shall constitute Event of Default by [Debtor]:

---

[6] LL's Ex. 2; D's Ex. 2.

3

> A.  [Debtor] fails or refuses to pay any Rent, other monies payable as Rent under this Lease at the specified time and place and such default should continue for more than five (5) days; or, . . .
>
> C.  [Debtor] shall be late twice during the Lease Year[7] in the payment of Rent or other sums or charges due Landlord under this Lease or shall repeatedly default in the keeping, observing or performing of any other covenants or agreements herein contained to be kept, observed or performed by [Debtor] . . . .

17.3    NO WAIVER.  No waiver of any agreement of this Lease, or of the breach thereof, shall be taken to constitute a waiver of any subsequent breach of such agreement, nor to justify or authorize the non-observance of any other occasion of the same or any other agreement hereof; nor shall the acceptance of Rent by Landlord at any time when [Debtor] is in default be construed as a waiver of such default or of Landlord's right to terminate this Lease on account of such default; nor shall any waiver or indulgence granted by Landlord to [Debtor] be taken as an estoppel against Landlord, it being expressly understood that if at any time [Debtor] shall be in default hereunder, an acceptance by Landlord of Rent during the continuance of such default or the failure on the part of Landlord promptly to avail itself of such other rights or remedies as Landlord may have, shall not be construed as a waiver of such default, but Landlord may at any time thereafter, if such default continues, terminate this Lease on account of such default in the manner herein provided.

23.1    NOTICE. Any bill, statement, notice, communication or payment which Landlord or [Debtor] may desire or be required to give to the other Party shall be in writing and shall be sent to the other Party b[y] either: (a) certified mail, return receipt requested, postage prepaid; (b) personal delivery; (c) nationally recognized overnight delivery service; or (d) facsimile with a "hard copy" sent by either of the means provided in (b) or (c) above to the address specified in Section 1.0, . . . and such notice shall be deemed delivered and received: (i) if by certified mail, upon three (3) days after being deposited in an official United States Post Office, postage prepaid; (ii) if by courier, upon delivery by courier; (iii) if be nationally recognized overnight delivery service, one (1) day after the deposit thereof with all delivery charges prepaid; or (iv) if by facsimile, on the date of transmission, provided that such facsimile is sent on a business day and a confirmation sheet is received and a copy of the notice is simultaneously delivered by either of the means provided in (b) or (c) above, respectively. Nothing contained herein shall limit either Party from posting notices in a manner authorized by Florida law.

---

[7] The Lease Year, as defined in Section 2.91 of the Lease, runs from Sept. 1 through Aug. 31.

SECTION 24.0 OPTION TO RENEW.

Provided [Debtor] is not in default, and has not been in default, of any provisions of this Lease, Landlord grants to [Debtor] the right to extend this Lease for two (2) periods of five (5) years, under the same terms and conditions as the Initial Term, except that Minimum Annual Rent shall be as stated in Section 2.4 hereof.

If [Debtor] elects to exercise this option, [Debtor] shall notify Landlord in writing at least six (6) months prior to the end of the Initial Term. If this Lease is terminated during the Initial Term for any reason whatsoever, [Debtor] shall have no rights to extend this Lease pursuant to this Section. [Debtor]'s failure to provide the written notice as required herein shall render such options null and void.

Shortly after the Addendum was executed, the COVID-19 pandemic gripped the nation, causing interruptions in Debtor's business which, in turn, caused Debtor to fall behind on its rent obligations under the Lease. Debtor failed to pay rent in April and May 2020, and again in November and December 2020. However, it is undisputed that the unpaid amounts, plus late fees, were cured prior to the expiration of the initial term of the lease.[8]

By letter dated October 28, 2020 (the "Renewal Notice"),[9] Debtor advised Landlord of his intent to renew the Lease for the second five-year term. Debtor also advised that it planned to remodel the bathrooms and kitchen at the Property and would be closed during the month of November for the renovations.[10] During the end of 2020 and into the late spring of 2021, Debtor made several upgrades to the Property and paid for repairs to mechanical systems, aimed at improving its customers' experience and responding to their health and safety concerns related

---

[8] Debtor paid the April 2020 rent on May 13, 2021, and the May 2020 rent on June 23, 2021. The November and December 2020 rents were cured on August 20, 2021. LL's Ex. 7; Doc. 80 Ex. A.

[9] D's Ex. 21.

[10] In a text exchange on Dec. 15, 2020, between Messrs. Jaffan and Sutaria, Mr. Jaffan noted that Debtor had upgraded the bathrooms and had been closed the month prior. Mr. Jaffan's comment may have been overlooked by Mr. Sutaria as Mr. Jaffan was responding to a plea that Debtor "catch up" on past due rent and not with the answer Mr. Sutaria wanted to hear. At the time, Debtor was four months in arrears. D's Ex. 11 pp. 3–4.

to the COVID-19 pandemic.[11]  Mr. Jaffan testified that all of these expenses were incurred "in anticipation of renewal" of the Lease.

Mr. Jaffan sent the Renewal Notice by first class mail to Landlord at the address contained in the Lease.  It was not returned to him as undeliverable.  Nonetheless, Mr. Sutaria testified that the Renewal Notice was not received.  In fact, Mr. Sutaria testified that he first learned Debtor took the position that it had renewed the lease in late August 2021, when Debtor's counsel, Mr. Bagge, responded to an August 13, 2021, demand letter sent by his counsel, Mr. Edwards.[12]

Throughout their relationship, the parties typically have communicated by text and email. Mr. Sutaria's communications with Debtor were somewhat limited.  Mr. Sutaria, who resides in Jacksonville, actively participated at the outset of the relationship and played a significant role in the negotiation and preparation of the Lease, but thereafter he did not communicate regularly with the Debtor.  Rather, one of Mr. Sutaria's business partners, Hitesh Kotecha, was responsible for regular communications with Debtor.  Oddly, Mr. Kotecha did not testify at trial.

In describing Debtor's relationship with Landlord, specifically on the issue of late payments, Mr. Jaffan said: "everything was cooperated."  Mr. Jaffan testified that Mr. Kotecha verbally agreed to a payment arrangement whereby Debtor would make double rent payments beginning in April 2021 until the four-month, largely pandemic-related arrearages were cured.[13] Although Debtor ultimately failed to make good on the agreement, Mr. Jaffan stated that

---

[11] As examples, Debtor upgraded outdoor seating options, relandscaped, installed hurricane doors at the main entrance, installed several televisions and other entertainment technologies in the dining room, and opened the kitchen to the dining room. He also purchased and installed a large brick pizza oven. D's Exs. 44–47.
[12] LL's Ex. 12.
[13] D's Ex. 11 pp. 9–10.

regarding tardy payments, Debtor was never charged attorney fees or interest, only late fees.

Mr. Sutaria described Debtor as habitually late with the payment of rent. In his words, Debtor "never paid on time." Mr. Sutaria conceded, however, that as and as a result of the Addendum, Debtor was current, and the payment-related defaults were washed away.[14] Debtor's reprieve was short lived, as Debtor resumed making delinquent rent payments in February 2020.[15] Mr. Sutaria did not dispute that from time to time, primarily before the Addendum, the Landlord accommodated Debtor with an "adjustment" to the payment due date.[16] However, he stated that any such adjustment was neither a "waiver" of the late payment default nor a "modification" to the Lease. At all times, Landlord maintained its position that late payments were not acceptable as a matter of course and that the expectation was that rent would be paid on time as agreed.[17]

Regarding Debtor's improvements and updates to the Property, Mr. Sutaria claimed he was unaware of any such improvements. He indicated that in mid-August 2021, he visited the Property to investigate a leak in a bathroom sink but he did not notice any difference to the bathroom; his last time seeing the bathrooms was in 2017. His August 2021 visit to investigate the leak was his first visit to the Property in several years.

Mr. Sutaria often relied upon his brother-in-law, Mr. Choksi, to stay abreast of developments at the shopping center. Though not an employee or formal agent of Landlord, Mr. Choksi served in the capacity of agent on limited occasions and for discrete purposes as directed by Mr. Sutaria.[18] Mr. Sutaria did not dispute that Mr. Choksi spoke to Mr. Jaffan

---

[14] The amendment to the payment due date was prompted by Debtor's consistently late payments.
[15] *See* LL's Ex. 7; D's Ex. 16.
[16] D's Exs. 33, 34, 36, & 38.
[17] *See, e.g.*, LL's Ex. 6 pp. 4–6 (text conversation dated March 6, 2021, between Messrs. Jaffan and Kotecha).
[18] Mr. Sutaria indicated that on one occasion, he authorized Mr. Choksi to execute a time sensitive lease agreement.

regarding matters at the Property, but stated that when he did, he did not do so as an agent of Landlord.

For his part, Mr. Choksi verified that sometimes he would help the Landlord. Though he spends nearly every day at the shopping center, Mr. Choksi indicated he had not noticed Debtor's renovation efforts and stated he had not been inside the Property for years, though he did state that he helped unload the large pizza oven that Debtor installed in his kitchen. He also testified that he accompanied Mr. Sutaria when he inspected the bathrooms at the Property in mid-August 2021. On most points, Mr. Choksi's testimony was not terribly credible. He denied observing even the substantial outdoor renovations by Debtor. The Court believes that he was aware of Debtor's renovation efforts and had been inside the Property on occasion, and that he very likely conveyed his observations to the Landlord.

On April 16, 2021, Landlord's counsel sent Debtor two notices of default: the first monetary and the second non-monetary.[19] In the first, Landlord asserted that Debtor owed $27,820.00 for back rent for five months, "exclusive of late fees/charges, interest, attorney's fees and costs."[20] In the second, Landlord asserted non-monetary defaults including, inter alia, construction of unapproved structures.

Debtor responded through counsel by letter dated May 3, 2021.[21] With regard to the alleged unapproved structures, Mr. Bagge noted that a code enforcement case had been opened in October 2019 regarding the complained-of improvements, but Debtor was found "in compliance" and the case dismissed. Further, Mr. Bagge noted that the structures had existed for years even prior to the execution of the Addendum. Regarding the past due rent, which

---

[19] LL's Exs. 8 & 9.
[20] LL Ex. 8. The fifth month was April 2021, for which rent had just come due and was then unpaid.
[21] D's Ex. 28.

accrued during the pandemic, Debtor asserted that Landlord had agreed to a deferred payback agreement whereby Debtor would cure when the business environment improved.[22] Mr. Jaffan testified that business was "picking up" and "much better now."[23]

By letter dated May 20, 2021, Mr. Edwards responded to Mr. Bagge.[24] He put aside the non-monetary defaults and focused on two points. First, though lauding Debtor's effort to cure rent arrears, he noted that Landlord disputed the existence of any deferred payback agreement. He offered to provide a "payoff" to cure Debtor's monetary obligations. Second, he noted that Debtor had not exercised the Lease renewal option timely nor could have as at the relevant time, Debtor was (and remained) in default under the Lease's terms.

In the May 20 letter, Mr. Edwards also mentions that discussions between the parties had begun regarding the expiration of the initial term and that Landlord had secured a new tenant set to occupy the Property on September 1. Based upon the correspondence, the Court presumes that discussions were in their nascent stages. Though mentioned in the letter, the Court notes that no mention of the new tenant was made at trial.

On August 13, 2021, Mr. Edwards sent Mr. Bagge another letter.[25] As in his prior letter, Mr. Edwards notes that the Lease was set to expire on August 31 at the end of the initial term and requests that Mr. Bagge assist in coordinating a date for a moveout walkthrough. Again, he mentions a new tenant set to take possession on September 1. And he states, as of that date, Debtor still owed past due rent for two months, excluding accrued late fees/charges, interest, attorney's fees and costs. No mention is made of non-monetary defaults.

---

[22] Just before the May 3, 2021 letter was sent, Debtor paid the April 2021 rent. Debtor timely paid the May 2021 rent a few days later. *See* LL's Ex. 7.
[23] Although not part of the trial record, statements made by the Subchapter V Trustee at hearings on Debtor's use of cash collateral support Mr. Jaffan's testimony regarding its improving operations.
[24] LL's Ex. 10.
[25] LL's Ex. 11; D's Ex. 29.

9

Mr. Bagge responded by letter dated August 27, 2021.[26] He asserted that Debtor had timely renewed the Lease and disputed that the term was set to expire on August 31. Further, having become current on its monthly rent obligations in the week prior, Debtor claimed it was in compliance with all its obligations under the Lease.

Debtor did not vacate the Property on August 31. Rather, to date, Debtor remains in possession of the Property and continues to operate its restaurant business.

On September 1, 2021, the day after the expiration of the Lease's initial term, Landlord commenced an action in state court asserting that Debtor was a holdover tenant at sufferance and seeking its eviction from the Property.[27] Debtor timely answered the state court complaint and as it disputed the amount of the rent due, filed a motion to determine rent. Debtor claimed it had extended the lease and that Landlord was not entitled to double rent as alleged.[28] Debtor's motion to determine rent was never decided.[29]

On the morning of January 28, 2022, shortly before what appears to have been a final pretrial conference, Landlord moved for a default judgment on the basis that Debtor had not complied with its obligations to pay rent into the court registry. Though it paid the regular, *i.e.*, non-doubled, rent for September 2021 into the registry, Debtor did not deposit any further rent into the state court registry due to the pendency of the motion to determine rent.

Before the state court could render its decision, which appears to have been favorable to the Landlord, on February 4, 2022, Debtor filed this bankruptcy case.

At trial, Debtor admitted that it had no proof of mailing the Renewal Notice to Landlord,

---

[26] LL's Ex. 12 p. 5.
[27] LL's Ex. 14; *see also* Doc. 20 (Aff. of Nilesh Sutaria sworn Feb. 16, 2022).
[28] LL's Ex. 15.
[29] The Court takes judicial notice of the docket in the state court eviction action. A copy of the docket, as of March 1, 2022, was filed by Landlord as part of its Notice of Filing State Court Documents (Doc. 42).

be that receipt or otherwise. Further, Debtor conceded that in all the various correspondence or conversations, Landlord never used the term "waiver" nor expressly waived the defaults under the Lease.

Mr. Jaffan candidly and credibly testified that should it be determined that the Lease expired, there was no realistic possibility of Debtor relocating its business. He noted that Debtor cannot remove the fixtures it installed nor get back what it spent to "build out" the Property. Further, there was no guarantee that Debtor's regular clientele would follow the restaurant should it move, and Mr. Jaffan lacked the financial resources necessary to invest to develop a new customer base.

As of the date of trial, Debtor was not current on its rent obligations as no rent was paid or deposited into the state court registry for the four-month period beginning October 2021 through the filing of Debtor's bankruptcy petition. It was not disputed that Debtor was current on its post-petition rent obligation.[30] Nonetheless, Mr. Jaffan testified that Debtor stands ready to cure, promptly, all outstanding rent arrears should the Court deny the Motion.

Discussion

Landlord seeks relief from the automatic stay to complete its state court eviction action. Landlord takes the position that the Lease expired, prepetition, at the end of the initial term on August 31, 2021. Landlord therefore argues that Debtor is unable to assume the Lease and treat it under a proposed plan of reorganization and that, in turn, its motion to lift the stay must be granted.

Preliminarily, Landlord moved for relief from the stay pursuant only to § 362(d)(2).[31] Assuming without deciding that Landlord proved Debtor lacked equity in the Property, the

---

[30] *See* Doc. 52.
[31] All references are to 11 U.S.C. §§ 101–1532 ("Code" or "Bankruptcy Code") unless otherwise stated.

Court finds that Debtor more than demonstrated that the Property was necessary to its reorganization.[32] For that matter, Mr. Jaffan's testimony that remaining at the Property was vital to Debtor as it could not simply relocate and start the restaurant anew was unrebutted.[33] Were the Court to take the Motion at face value, the Motion would need to be denied.[34]

But through the course of these proceedings, it is clear that the Landlord also seeks relief from the stay pursuant to § 362(d)(1) for "cause." "[A] party seeking relief from the automatic stay must establish a prima facie case of cause for relief."[35] If established, the burden shifts to the debtor to show cause does not exist and that it is "entitled to protection of the automatic stay."[36]

As it is oft said, "cause" is undefined in the Bankruptcy Code.[37] Certainly, if the Lease expired such that Debtor could not assume it and remain at the Property, cause would exist to lift the stay. On that point, the parties agree. However, if the Lease were renewed pursuant to its terms or if there are circumstances that militate against the forfeiture of Debtor's leasehold interest in the Property, relief from the stay would not be appropriate.[38]

Landlord's Prima Facie Case

Section 24 is the Lease's operative provision as to Debtor's option to renew the Lease beyond the initial five-year term ("Section 24"). The Lease does not require Landlord to

---

[32] *See* §§ 362(d)(2), (g).
[33] *Cf. In re 412 Boardwalk, Inc.*, 520 B.R. 126, 134 (Bankr. M.D. Fla. 2014).
[34] The Motion confuses the issues. Whether the Lease is assumable is a separate question from whether the Property would be necessary to an effective reorganization by the Debtor.
[35] *In re 412 Boardwalk, Inc.*, 520 B.R. at 132.
[36] *In re Brumlik*, 185 B.R. 887, 889 (Bankr. M.D. Fla. 1995).
[37] *See Lord v. True Funding, LLC*, 618 B.R. 588, 592 (S.D. Fla. 2020) ("'Cause' is not defined under § 362(d) and therefore is assessed on a case-by-case basis, with courts being afforded wide latitude in deciding whether to grant relief."); *see, e.g., In re 412 Boardwalk, Inc.*, 520 B.R. at 132; *In re White*, No. 3:14-bk-00151-JAF, 2014 WL 4443422, at *2 (Bankr. M.D. Fla. Sept. 3, 2014); *In re Aloisi*, 261 B.R. 504, 508 (Bankr. M.D. Fla. 2001).
[38] *See, e.g., In re Jerusalem Rest., Inc.*, No. 6:18-bk-01065-CCJ, 2018 WL 11206148, at *1 (Bankr. M.D. Fla. July 12, 2018); *In re PetitUSA, LLC*, No. 16-10305-BKC-LMI, 2016 WL 8504995, at *1 (Bankr. S.D. Fla. Apr. 5, 2016); *In re 2408 W. Kennedy LLC*, 512 B.R. 708 (Bank. M.D. Fla. 2014).

approve nor authorizes it to reject an exercise of the option to renew.[39] To exercise its option, Debtor was required to provide written notice of its intent to renew no later than six months prior to end of the initial term. Though not expressly incorporated by Section 24, Section 23 of the Lease required that the written notice of the exercise of the option to renew be provided to Landlord by either certified mail, personal delivery, "nationally recognized overnight delivery service," or facsimile with additional "hard copy" delivery.[40] But, Debtor's right to exercise its option arose only if Debtor "[was] not in default, and ha[d] not been in default, of any provision[]" of the Lease.[41]

*Notice of Intent to Renew*

Pursuant to Section 24, Debtor was required to give written notice, by an authorized means, of its intent to renew the Lease by no later than February 28, 2021. Debtor proffers the Renewal Notice dated October 28, 2020. While undoubtedly a timely "written notice," the Renewal Notice was not sent by means authorized by Section 23.

The Court finds Mr. Jaffan's testimony that he sent the Renewal Notice by first class mail to be credible. The Court is less certain as to Mr. Sutaria's testimony that the Renewal Notice was not received. Even then, the Court finds that under the totality of the circumstances, Landlord either knew or should have known that it was Debtor's intention to renew the Lease beyond the initial term.

But it is indisputable, in fact it is conceded, that the Renewal Notice was not sent by a means authorized by Section 23. Thus, this point goes to the Landlord.

---

[39] LL's Ex. 1 ¶¶ 2.3 B, 24.
[40] LL's Ex. 1 ¶¶ 23–24.
[41] LL's Ex. 1 ¶ 24.

*Debtor's Defaults Under the Lease*

Pursuant to Section 24, Debtor's option to renew was available only if Debtor "[was] not in default, and ha[d] not been in default, of any provision[]" of the Lease. The provision does not distinguish between monetary and non-monetary defaults, both of which Landlord had asserted in the notices dated April 16, 2021.

Though Mr. Edwards' letter of May 10, 2021, did not concede the validity of Landlord's prior notice of non-monetary default, the absence of similar allegations in his letter of August 13, 2021, and the failure to present any evidence at trial of any such non-monetary default is telling. The Court concludes therefore that Landlord accepted Mr. Bagge's explanations offered in his letter of May 3, 2021, and that Debtor was not in default of any non-monetary requirement under the Lease and Addendum.

As it happens, Landlord relies on Debtor's non-payment and/or history of untimely payment of rent. The parties stipulated to Debtor's payment history since execution of the Addendum, and Debtor does not dispute that rent payments were made untimely or that at the time of the Renewal Notice, Debtor was two months in arrears on payment of rent. For that matter, the stipulated payment history reflects that it was not until August 20, 2021, that Debtor fully cured the rent arrears.

Recognizing the payment history for what it is, Debtor argues Landlord waived these payment related defaults. Debtor's argument, however, is not compelling for two primary reasons. First, Section 17.3 of the Lease contains a "no waiver" clause and that particular reservation of rights to the Landlord is repeated in several other instances in the Lease and Addendum. Second, although matters may have been "cooperated," Debtor conceded that Landlord never expressly waived the payment defaults and that the communications between

the parties in the record do not evidence a waiver. Rather, Landlord's insistence on the timely payment of rent never waivered (pun intended). Debtor's best argument is the alleged oral agreement between Messrs. Jaffan and Kotecha that Debtor could "catch up" by timely paying double rent beginning in April 2021; however, the stipulated payment history shows that Debtor breached that agreement from day one.

Thus, here too, the point goes to the Landlord. And, accordingly, the Court finds that Landlord has stated a prima facie case for cause to lift the stay.

Debtor's Rebuttal Case

In rebuttal, Debtor raises two primary arguments: first, waiver, which is addressed above, and second, Florida's anti-forfeiture doctrine. The Court finds that on the facts of this case, Debtor's second argument is persuasive.

In the context of landlord-tenant disputes, Florida law provides the equitable remedy of anti-forfeiture "whenever it is just and equitable to do so; the only condition precedent . . . being the tender of the arrears of rent with accrued interest."[42] As the Florida Supreme Court stated long ago, "courts of equity always mitigate forfeitures when it can be done without doing violence to the contract of the parties."[43]

Here, it is undisputed that Debtor had cured or substantially cured the rent arrears before the expiration of the initial term, rent arrears that the Court notes were brought about by the extraordinary circumstance of a worldwide pandemic. Further, notwithstanding the technical defect in the means of delivery of the Renewal Notice, Landlord knew, or should have known, of Debtor's intent to exercise its option to renew the Lease based upon its awareness of Debtor's

---

[42] *Ross v. Metro. Dade Cty.*, 142 B.R. 1013, 1016 (S.D. Fla. 1992) (quoting *Rader v. Prather*, 100 Fla. 591, 595, 130 So. 15, 17 (1930)), *aff'd*, 987 F.2d 774 (11th Cir. 1993); *see also In re PetitUSA, LLC*, 2016 WL 8504995, at *3–*4; *In re 2408 W. Kennedy*, LLC, 512 B.R. at 713.
[43] *Rader v. Prather*, 100 Fla. 591, 595, 130 So. 15, 17 (1930).

efforts to update and improve the Property gained either through Mr. Jaffan's communications with Mr. Kotecha or through the observations of Mr. Choksi.

Although the Landlord is technically correct and the Lease could not be renewed pursuant to its terms, Debtor has demonstrated to the Court's satisfaction that equity must intervene to prevent the forfeiture of Debtor's leasehold interest.[44]

Though the Court finds that Debtor has satisfied its burden to demonstrate an equitable exception to the termination of the Lease, going forward, Debtor must not only learn from, as Mr. Jaffan testified, but correct the mistakes of the past to maintain the protections of the automatic stay. One point clear to the Court is that the relationship between the parties has suffered numerous miscommunications seemingly brought about by language difficulties and differences both as between the parties and as between the parties and the Lease itself.[45]

For these reasons, it is **ORDERED**:

1. The Motion (Doc. 23) is **DENIED, without prejudice**, conditioned upon the provision of additional adequate protection to the Landlord as provided below.

2. As additional adequate protection due Landlord, Debtor shall, **by no later than May 23, 2022**, become current on its monetary obligations under the Lease. This necessarily includes unpaid rent at the monthly rate as defined in the Lease but also includes, as provided in the lease, all accrued late fees/charges, interest, attorney's fees and costs. Debtor shall, as provided below, remit all amounts due by payment care of Landlord's counsel.

3. Landlord shall, within ten (10) days of entry of this Order, provide to Debtor and file with the Court, an itemized statement setting forth all unpaid amounts claimed due to date

---

[44] *See, e.g.*, *In re PetitUSA, LLC*, 2016 WL 8504995, at *4.
[45] The Lease and Addendum are written in English, and neither party's representatives nor Mr. Choksi appear to be native English speakers. Based upon his communications in the record, neither is Mr. Kotecha.

under the terms of the Lease. As part of said filing, counsel for Landlord shall file an attorney's fee affidavit setting forth, with appropriate time records, its fees and costs incurred to date.

4. Debtor may object to the Landlord's itemized statement or to the reasonableness of the claimed attorney's fees and costs by appropriate filing made within ten (10) days after the itemized statement is filed with the Court; however, an objection shall not serve to relieve Debtor from the timely payment of all amounts claimed due and owing by Landlord.

5. If Debtor timely files an objection to the Landlord's itemized statement or to the reasonableness of the claimed attorney's fees and costs, Landlord shall have ten (10) days to file any response. Upon the filing of a response, the Court will take the matter under advisement but reserves the right to set a hearing if, upon review, it is deemed appropriate.

6. Upon the payment by Debtor of the amounts claimed due in the itemized statement, counsel for Landlord shall remit to Landlord an amount sufficient to cure the monthly rent obligations at the regular, *i.e.*, non-holdover, rate as set forth in the Lease. Counsel shall hold the balance of Debtor's payment in its trust account pending the filing of an objection pursuant to paragraph 4 above. If Debtor files an objection, counsel may, without further order, remit any undisputed amounts to Landlord; however, counsel shall hold any disputed amounts in its trust account pending further order of the Court.

7. Should Debtor fail to make the additional adequate protection payment as ordered above, Landlord may file an affidavit of default, and the Court will grant immediate relief from the automatic stay without further hearing.

8. Consistent with the Court's prior order (Doc. 52), rent at the regular rate as set forth in the Lease shall continue to be paid to Landlord by the tenth (10th) of each month as adequate protection. Upon any default in the timely payment of the monthly rent and the failure

to cure said default within twenty-four (24) hours of notice being provided to Debtor by email to Debtor's counsel, Mr. Jonathan A. Semach (all@tampaesq.com), Landlord may file an affidavit of default, and the Court will grant immediate relief from stay without further hearing.

9. The Court will defer ruling on the Debtor's Motion to Assume the Lease (Doc. 60) until consideration of any plan of reorganization for confirmation.

Attorney Michael S. Provenzale, Esq. is directed to serve a copy of this Order on interested parties who do not receive service by CM/ECF and to file a proof of service within three days of entry of this Order.